Filed 6/25/21  P. v. Maldonado CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>IRVIN DAVID MALDONADO<br><br>　　Defendant and Appellant. | B307089<br><br>(Los Angeles County<br>Super. Ct. No. NA106453) |

APPEAL from an order of the Superior Court of Los Angeles County.  James D. Otto, Judge.  Affirmed.

Douglas J. Jalaie, Esq., for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

In 2019, appellant Irvin D. Maldonado filed a motion to vacate his 2017 conviction of lewd acts on a child under the age of 14. Maldonado claimed his attorney failed to advise him about the adverse immigration consequences of taking the plea deal. Appellant also claimed to have new evidence of actual innocence in that the child recanted her allegations against him. The trial court denied appellant's motion.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    2017 Felony Conviction of Lewd Act upon a Child

On May 17, 2017, the People filed a felony complaint against appellant, charging him with 10 counts of committing a lewd act upon a child under the age of 14, in violation of Penal Code[1] section 288, subdivision (a). The named victim is his stepdaughter Vanessa D. (Vanessa).

We glean from the probation officer's report that Vanessa told her grandmother she was being molested by her stepfather; grandmother then took Vanessa to the police. Vanessa reported that when she was eight years old, she "was sleeping and awaken[ed] to her stepfather touching her vagina with his fingers." She was "afraid" and pretended to be asleep, and he continued to fondle her for 40 minutes. He had shown her his penis several times and had masturbated in front of her. She said he "touched her butt and put his fingers in her rectum." She also said he had showed her movies of "two girls having sex."

---

[1]    Further undesignated statutory references are to the Penal Code.

2

Vanessa, now age 10, reported the abuse continued to take place. She had cried and asked appellant to stop, but appellant told her "not to tell anyone."

The police interviewed appellant, who "initially denied his actions, but later admitted" Vanessa had touched his penis, and he had touched her buttocks and "penetrated the lips of her vagina with his fingernail tips." He admitted this happened on numerous occasions.

On August 31, 2017, appellant, represented by counsel Adrian Woodward, pleaded no contest to two counts of committing a lewd act upon a child. He was sentenced to three years in prison.

We have not been provided with a copy of the court's minute order or the reporter's transcript of the plea that took place on August 31, 2017. As a result, we do not have a record of any advisements or discussions about immigration consequences that may have been given at the plea.

II.    2019 Motion to Vacate the 2017 Conviction

On October 11, 2019, appellant, with new counsel Jerome Haig (Haig), filed a motion to vacate his 2017 conviction pursuant to section 1473.7. Appellant alleged that his "prior counsel Adrian Woodward never discussed the immigration consequences of the plea agreement" and "never told [appellant] that he would be deported if he accepted the plea offer." Appellant argued his former counsel's "deficiencies" constituted ineffective assistance of counsel and damaged his ability to meaningfully understand and defend against the immigration consequences of his plea. Appellant further alleged to have newly discovered evidence of actual innocence because Vanessa, one year earlier, had recanted her accusations and told defense counsel Woodward that she had

3

lied to the police. Appellant argued his former counsel's deficient representation and the existence of newly obtained evidence of innocence constituted grounds to vacate his 2017 conviction.

In support of his motion, appellant submitted three sworn declarations: one from former counsel Woodward, one from Vanessa, and his own.

Appellant's sworn declaration set out the following facts. Appellant was born in Mexico and came to the United States with his parents when he was about one year old. He is now a legal permanent resident. Although appellant completed his sentence in July 2019 and was released on parole, he was detained by the United States Immigration and Customs Enforcement (ICE) and placed in removal/deportation proceedings as a result of his 2017 conviction. (He was in immigration detention when he filed the motion and consequently did not attend the hearing.)

Appellant asserted he pleaded no contest on August 31, 2017 because Woodward told him he "had no chance to prevail at trial" as the jury would believe Vanessa and not him. Woodward told him he "would receive much more time, likely the maximum sentence . . . in excess of 30 years" if he went to trial, but that he would serve only 18 months if he took the prosecution's offer of three years. Appellant stated he "would not have pleaded no contest had [he] known that Vanessa had told the truth about what occurred – that [he] never sexually assaulted her."

Next, appellant asserted Woodward "never mentioned anything about the immigration consequences of pleading no contest" and never said he would be deported if he accepted the plea offer. Appellant further asserted had he known he would be subject to deportation, he would not have pleaded no contest and "[i]nstead . . . would have fought the charges."

4

Vanessa—then 13 years old and in the 7th grade—provided the following in her declaration:

"In 2017, I started telling lies about my step-father. I told the police that he touched me in private parts of my body, showed me his penis, asked me to pull down my pants, and other sexual things. [¶] I lied to the police about all the things that I told them about my step-father. The truth is that my step-father . . . never touched me in any sexual way, never exposed his private parts or penis to me, never asked me to undress, or show him any part of my body. [¶] I lied to the police because I was upset that my step-father was spending too much time with my family and my mother. I was also mad at my step-father because he was too strict with me. He made me do my homework before fun things like video games."

After appellant went to jail, Vanessa felt "very badly about lying" and decided to tell appellant's counsel Woodward that she had lied to the police. Vanessa asserted her mother "has never put any pressure on me to say that I lied to the police two years ago. I am doing this on my own."

In his declaration Woodward set out that he represented appellant in the underlying criminal case. Woodward "received no discovery or evidence undermining the credibility of the prosecution's case" during his representation of appellant. Woodward "personally interviewed" Vanessa, who "reiterated the facts in the police reports" and "never recanted." After interviewing Vanessa, Woodward recommended that appellant accept the prosecution's plea agreement. Appellant took Woodward's advice and accepted the offer.

After the case closed, Vanessa came to Woodward's office and he re-interviewed her alone. She told him she "lied to the

police and that [appellant] had never touched her in any inappropriate or sexual manner." She admitted she "had done a bad thing making up this story." As a result, Woodward alerted the deputy D.A., sending a letter about Vanessa's recantation. Woodward was told "there was nothing [the D.A.'s] office would do to reverse the conviction, reopen the investigation, or re-interview Vanessa." Woodward asserted he "would never have recommended that [appellant] plead guilty or no contest to any offense" had he known Vanessa intended to recant and state that appellant "was factually innocent of all the charges."

On March 10, 2020, the People filed their opposition to appellant's motion. They asserted the D.A. recited the immigration consequences during the plea colloquy and had asked appellant whether he discussed the immigration consequences with his lawyer; appellant had answered in the affirmative. The People argued appellant did not state sufficient facts to demonstrate he was prejudiced by any alleged incompetence of counsel. They argued appellant failed to present any independent evidence to corroborate his own declaration that he would have rejected the plea offer but for Woodward's lack of advice. The People argue the disparity in sentencing between the terms of the plea agreement (3 years) and appellant's maximum exposure (26 years) was significant; it "stands to reason that [he] accepted the people's offer in order to avoid the substantial state prison exposure."

Finally, the People argued "it is not uncommon for victims to recant in order to protect their abuser" and it is "not particularly surprising in this case given the fact that victim's own mother has always been on [appellant's] side." They argued the recantation and its timing is "suspect" given the pending

6

deportation proceedings. The People noted appellant had previously "admitted to touching victim's butt, vagina, and putting his finger on her vagina."

On June 22, 2020, appellant replied to the People's opposition. He argued he would have never "accepted a disposition . . . knowing that he would be permanently separated from his family, his wife, his child, and his homeland." He has lived his whole life in the United States since arriving with his parents when he was 11 months old.

In reply, he submitted three more declarations: one from Zoila Lomeli, appellant's older sister; one from Katie Siler, appellant's immigration attorney; and one from his current counsel, Haig.

Zoila Lomeli stated appellant's "whole family lives in this country—our parents, siblings, grandmother, aunts, uncles, and cousins" whereas there is "only one relative, an aunt, who resides in Mexico." Zoila stated she was present during the August 31, 2017 hearing and recalled a conversation with Woodward in the hallway outside the courtroom, where he explained the plea. Based upon what Woodward said in the hallway, Zoila felt her brother had no choice but to accept the plea offer and she told Woodward to tell appellant to "take the deal. A few minutes later, [appellant] accepted the plea deal." Zoila stated she was never told by Woodward about the possibility that appellant "would be deported based upon this case."

Katie Siler provided the following information. Appellant is a citizen of Mexico who came to the U.S. in 1989 when he was 11 months old. He became a lawful permanent resident in January 2016 through his citizen wife's visa petition. Appellant's 2017 conviction constituted an aggravated felony which made

7

him deportable and ineligible for relief from deportation. If appellant were ordered deported, he would be barred from returning to the United States for at least 10 years. "As an immigration attorney, if [Siler] had been consulted prior to" appellant pleading no contest to the crime of lewd act upon a child, she "would have advised him not to enter such a plea because it is an aggravated felony and would make him deportable."

Haig declared that to prepare for this case, he requested and received Woodward's case file. While reviewing the file, Haig noted photos and videos were missing. Haig contacted Woodward, who said he did not have electronic evidence. Haig found "only two pages of attorney notes" and nothing in the file about appellant's immigration status, any negotiation for an immigration-neutral disposition or any immigration advisements. Based on his review of the file and discussions with Woodward, Haig believed "it is clear [Woodward] did not know and appreciate the [e]ffect of a Penal Code § 288(a) conviction on [appellant's] immigration status." Haig asserted he would have consulted with an immigration attorney, educated himself on the particulars of appellant's immigration status, and sought an immigration-neutral disposition.

On July 17, 2020, Woodward submitted another sworn declaration with the following information. Woodward "believe[d] it was in [appellant's] best interest" to enter into a plea with the D.A. based on his "investigations and discussions." Vanessa approached him about recanting her testimony at "a date subsequent to the plea" and after appellant was already "serving his time." Woodward asked the D.A. to review Vanessa's new

8

information but was informed they "would not consent to a withdrawal of the plea."

Further, Woodward recalled appellant was advised of his immigration consequences during the sentencing hearing in 2017. "Due to the passage of time," Woodward did not recall any specific discussion with appellant in 2017 regarding immigration issues, but explained it is his "practice to advise all of [his] client[s] of their immigration consequences when facing a felony conviction." Woodward was aware a conviction of this type of charge *may* result in deportation.

III.     Hearing and Ruling on Motion to Vacate

The contested hearing on appellant's motion took place on July 17, 2020. The court took judicial notice of the plea and sentencing transcript; however, the record before us does not include a copy of that transcript.

Three witnesses testified.

Woodward: Woodward has been an attorney since 1995. He was retained by appellant's family in May 2017. Prior to being retained in appellant's case, Woodward had handled about 20 section 288 child molestation cases. He had interviewed Vanessa on two separate occasions prior to the plea hearing date.

He recalled meeting with the prosecutor about this case "at least three times, maybe more." He recalled receiving an "initial offer" sometime in April or May of 2017. The "earlier offer . . . was substantially different", somewhere around six years in state prison. Woodward offered the prosecutor a misdemeanor plea on appellant's behalf, but it was rejected. Instead, the prosecutor offered five years in state prison for two counts. Woodward made a counteroffer of three years in state prison, which was accepted.

9

Woodward recalled multiple occasions when he spoke with appellant. Woodward "believe[d]" appellant "had relayed to [him] that he was . . . on a Green Card" and was a "legal resident." After learning appellant was not a U.S. citizen, Woodward had a discussion about immigration-neutral resolutions with "one of [his] P.O.'s" and with an immigration lawyer. He "did discuss immigration consequences . . . if [his] memory serves [him] correctly." It was Woodward's practice to advise that felony convictions *could* have immigration consequences. He also recalled having "some discussion regarding immigration status" with the prosecutor.

After the case was closed, Woodward was contacted by Vanessa's mother (appellant's wife). Vanessa thereafter came to see Woodward at his office accompanied by her mother.

Vanessa: Vanessa, now 13, was about 10 years old when the 2017 proceedings took place. She confirmed she told police officers in March 2017 that appellant touched her vagina and butt, took photos of her private parts, and showed her pornography. She confirmed repeating the same allegations when she was interviewed at UCLA in April 2017, where she also reported appellant took nude photos of her with his cell phone. She confirmed repeating these allegations during the two interviews conducted by Woodward.

She decided to come "forward to just tell the truth" a year after sentencing because of a few *Law & Order* episodes she watched on TV. She told her mother the truth. Appellant never touched her in a sexual way, never showed her any pornography, and never pulled down clothing to expose body parts.

10

Vanessa testified she and her mother have never discussed this case since she initially reported the incident to police officers. She confirmed her mother drove her to court for the hearing.

Zoila: Zoila, appellant's sister, was present during the proceedings held August 31, 2017. She recalled Woodward never raised the issue of appellant's immigration status as a topic of discussion while talking to her and the family. She admitted she was not in the attorney room with Woodward and appellant when they were having discussions with one another. She was present in the courtroom when the prosecutor "advised [her] brother that 'if you are not a citizen, your plea will result in your deportation, denial of naturalization, denial of amnesty or denial of re-entry' and also asked him, 'have you discussed the immigration consequences with your attorney . . . ?' and [her] brother answered 'yes.' "

On July 29, 2020, the trial court issued its ruling, denying the motion to vacate. The court found appellant did not prove by a preponderance of the evidence that he was prejudiced by his former counsel's alleged errors. The court also found Woodward's representation did not fall below an objective standard of reasonableness under the prevailing professional norm. The court found: "The plea transcript supports Mr. Woodward's recollection that he advised [appellant] of the immigration consequences." The court referred to specific testimony made by Woodward and found "Woodward did consult immigration counsel and did try to reach an immigration neutral disposition." The court specifically found Woodward's testimony "more credible" as appellant's declaration "is inconsistent with the statement he made at the time of his plea regarding being

11

advised of immigration consequences and his statements to law enforcement."

As to Vanessa's recantation, the court did "not find her new testimony credible" and found her "inconsistent . . . as to whether she told her mother that she was going to Mr. Woodward's office to discuss her prior statements to him." The court found the reasons Vanessa gave for recanting "just not credible."

Appellant timely appealed.

## DISCUSSION

Appellant contends his conviction must be vacated because his prior counsel Woodward failed to advise him of the immigration consequences of his plea and failed to pursue an immigration-neutral disposition. He argues he was "heavily prejudiced" by Woodward's errors. Appellant also contends Vanessa's "recanting testimony was newly discovered evidence of actual innocence that required vacation" of his 2017 conviction.

I.    Applicable Law

Mandatory deportation from the United States is an immigration consequence when a defendant is convicted of a crime deemed an aggravated felony under federal immigration law. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188; 8 U.S.C. § 1228(c) [aggravated felony is conclusively presumed deportable].) With respect to appellant's case, a violation of section 288, subdivision (a), constitutes an aggravated felony that is a deportable offense under federal law. (8 U.S.C. § 1227(a)(2)(A)(iii) ["Any alien who is convicted of an aggravated felony at any time after admission is deportable"]; 8 U.S.C. § 1101(a)(43)(A) [aggravated felony included "sexual abuse of a minor"].)

12

Section 1473.7 authorizes a person who is no longer in criminal custody to move to vacate a conviction or sentence for any of the following reasons: "(1) The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere. . . . [¶] 2) Newly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice." (§ 1473.7, subds. (a)(1), (2).)

"Ineffective assistance of counsel that damages a defendant's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a guilty plea, if established by a preponderance of the evidence, is the type of error that entitles the defendant to relief under section 1473.7. [Citation.] To establish ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that he was prejudiced by the deficient performance." (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 75; see *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).)

Effective January 1, 2019, the Legislature amended section 1473.7 to clarify that a "finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) Therefore, a defendant asserting errors by counsel need not establish the elements of a claim for ineffective assistance of counsel. (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1008.) Instead, a defendant seeking relief via a motion under section 1473.7 must show *prejudicial error*

13

which is "not limited to the *Strickland* test of prejudice, whether there was reasonable probability of a different outcome in the original proceedings absent the error." (*Id.* at p. 1009.) To establish prejudice, a defendant must show by a preponderance of the evidence that he would not have entered the plea and would have risked going to trial had he known about the adverse immigration consequences. (*Id.* at pp. 1010–1011; see *People v. Martinez* (2013) 57 Cal.4th 555, 565 (*Martinez*) [defendant may show prejudice by "convinc[ing] the court [that he] would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow"]; see *Lee v. U.S.* (2017) 137 S.Ct. 1958, 1965 [a defendant can show prejudice by demonstrating a reasonable probability he would not have pled guilty and would have insisted on going to trial but for counsel's errors].)

II.    Standard of Review

The California Supreme Court recently determined the standard of review for section 1473.7 motion proceedings. In *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), the Court endorsed the independent standard of review. (*Id.* at p. 524.) Under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law. (*Id.* at p. 527.) When courts engage in independent review, they should be mindful that independent review is not the equivalent of de novo review. (*Ibid.*) An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. (*Ibid.*) Factual determinations that are based on the credibility of witnesses the trial court heard and observed are entitled to particular deference, even though courts reviewing such claims generally may reach a different

14

conclusion from the trial court on an independent examination of the evidence even where the evidence is conflicting. (*Ibid*.) In section 1473.7 motion proceedings, "appellate courts should similarly give particular deference to factual findings based on the trial court's personal observations of witnesses." (*Id*. at pp. 527–528.) Where the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, the trial court and this court are in the same position in interpreting written declarations when reviewing a cold record in a section 1473.7 proceeding. (*Id*. at p. 528.) Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7. (*Ibid*.)

III.    Analysis

As a preliminary matter, we note appellant has failed to provide us with a reporter's transcript of the August 31, 2017 plea and sentencing hearing—of which the trial court had taken judicial notice and which both parties refer to and rely on in their pleadings below. As a result, we do not know exactly what the trial court said with respect to immigration consequences. However, we find Woodward's July 17, 2020 declaration (where he recalled appellant was advised of the immigration consequences at the August 31, 2017 hearing) and Zoila's testimony in court (that she heard the prosecutor give immigration advisements to appellant during the August 31, 2017 hearing and heard appellant say "yes"), adequately substitute for the actual transcript of the August 31, 2017 hearing. We proceed on the evidence that the trial court advised

15

appellant that he would be deported based on the charges to which he was pleading no contest.

We also accept the proposition that Woodward incorrectly advised appellant that he *could* be deported rather than correctly telling him he *would* be deported based on the plea and conviction. That he investigated and attempted to negotiate what he thought was an immigration-neutral disposition does not mitigate the fact that he did not properly and correctly advise his client.

Nevertheless, we find unpersuasive appellant's assertion that had he been properly advised that he was facing mandatory deportation, he would have insisted on an immigration-neutral disposition and, failing that, gone to trial instead of accepting the plea agreement.

The only evidence that avoiding deportation was appellant's priority at the time of the plea was his own declaration. Appellant's assertion that he would not have pled but for Woodward's failure to advise him correctly of adverse immigration consequences is not sufficient by itself. (*Lee v. U.S.*, *supra*, 137 S.Ct. at p. 1967.) There must also be contemporaneous evidence to substantiate appellant's expressed preferences. (*Ibid*.) "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." (*Ibid*.) "It is up to the trial court to determine whether the defendant's assertion is credible, and the court may reject an assertion that is not supported by an explanation or other corroborating circumstances." (*Martinez*, *supra*, 57 Cal.4th at p. 565.) Among the many factors to be

16

considered are "the presence or absence of other plea offers, the seriousness of the charges in relation to the plea bargain, [appellant's] criminal record, [appellant's] priorities in plea bargaining, [appellant's] aversion to immigration consequences, and whether [appellant] had reason to believe that the charges would allow an immigration-neutral bargain that a court would accept." (*Martinez*, *supra*, 57 Cal.4th at p. 568.)

We are not convinced by appellant's insistence that he would have opted for trial had he been properly advised of the immigration consequences. Appellant had no prior criminal record and the maximum sentence he faced as a first offender if convicted after trial was 26 years in prison. The plea agreement, on the other hand, guaranteed him a three-year sentence. The People's case against him was strong in that it included his own admissions that he committed sexual acts on the child, corroborating, at least in part, Vanessa's accusations. His counsel and own sister were recommending that he take a plea to avoid a long prison sentence as conviction seemed assured. Neither he nor his sister inquired further about immigration consequences after being advised that deportation was a possibility. There is nothing in appellant's declaration to show that avoiding deportation was a priority of his at the time he entered into the plea agreement. During oral argument, counsel for appellant relied on the fact that appellant opted to remain in ICE detention for years to oppose deportation and remain with his family in the only country he has ever known as evidence that avoiding deportation is of the utmost priority for him. We might speculate that remaining in the country was important to appellant as this is the only country he has ever known, but whether that consideration rose to preeminence over avoiding a

17

long prison sentence *at the time of taking the plea* in 2017 is speculative based on the evidence before the trial court. Undoubtedly, removal from the United States after creating a life here is a nightmare; however, the test for prejudice considers what appellant would have done had he been advised of immigration consequences at the time of the plea and not the consequences appellant faced in July 2019 and continues to face now in 2021. (See *Martinez, supra*, 57 Cal.4th at p. 564.)

Taking into consideration the strength of the People's case and the significant disparity in sentencing between conviction by trial and conviction by plea, it is reasonable to conclude that the most likely probability is that these combined factors motivated appellant to agree to plead rather than go to trial and risk substantial prison time. Appellant's apparent indifference at the time of the plea to the idea of even *possible* immigration consequences further supports our analysis.

Finally, appellant contends Vanessa's recantation constitutes newly discovered evidence of actual innocence under section 1473.7, subdivision (a)(2), requiring vacation of the 2017 conviction. The People argue Vanessa's recantation is suspect as she waited over a year to come forward and is doing so now because appellant faces deportation. The trial court personally observed Vanessa as she testified. (See *Vivar, supra*, 11 Cal.5th at pp. 527–528.) The trial court did not believe Vanessa's new rendition of events, finding the reasons she gave for recanting "just not credible." We give particular deference to a trial court's ruling on witness credibility. (*Ibid*.) We see no reason to depart from that maxim with this witness.

Exercising our independent review while giving particular deference to the trial court's credibility determinations, we conclude appellant did not meet his burden for section 1473.7 relief.

## DISPOSITION

The order denying appellant's motion to vacate is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

GRIMES, J.

19